UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

JAN 24 2014

CLERK, US DISTRICT COURT
NORFOLK, VA

PROMONTORY INTERFINANCIAL
NETWORK, LLC,

Plaintiff,

v.                                          Civil No. 2:13cv243

ANOVA FINANCIAL CORPORATION,

Defendant.

## OPINION AND ORDER

This matter is before the Court following a Markman hearing, conducted for the purpose of construing eight disputed claim terms. After careful consideration of the briefs submitted by the parties and the arguments advanced at the Markman hearing, the Court issues this Opinion and Order detailing the claim constructions in this case.

### I. FACTUAL AND PROCEDURAL BACKGROUND

At issue in this case are nine related patents held by plaintiff Promontory Interfinancial Network, LLC, ("Promontory"),[1] and four related patents held by defendant Anova

---

[1] Promontory's patents are as follows: 7,596,522; 7,603,307; 7,899,745; 7,899,746; 7,899,747; 7,921,057; 8,036,986; 8,051,004; 8,051,005.

Financial Corporation ("Anova").[2] Generally speaking, both parties' patents are directed toward a financial transaction system/method that facilitates the depositing of funds in banks through matching depositors with banks. Promontory's patents claim methods and systems that preserve a depositor's direct relationship with a single bank but obtain the benefit of deposit insurance from the Federal Deposit Insurance Corporation ("FDIC") in excess of the amount that could otherwise be offered by such single bank. Anova's patents claim methods and systems that provide liquid deposit opportunities for depositors that are more desirable to banks because they are packaged in a way that increases the stability of the funds.

In the instant case, each party has asserted that the other party is violating the first party's valid and enforceable patents. The parties have identified numerous claim terms that at least one party contends require construction by the Court. However, the parties have stipulated to constructions for thirteen terms and reduced the outstanding dispute to eight claim terms. This Court's Markman construction of all terms identified as requiring construction is set forth below.

---

[2] Anova's patents are as follows: 7,895,099; 7,904,372; 8,090,651; 8,301,560. Patents for both parties will be abbreviated herein by their final 3 numbers (e.g. '099).

## II. CLAIM CONSTRUCTION PROCEDURE

In <u>Markman v. Westview Instruments</u>, the United States Supreme Court succinctly explained the basis for, and importance of, claim construction:

> The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8. Congress first exercised this authority in 1790, when it provided for the issuance of "letters patent," Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, which, like their modern counterparts, granted inventors "the right to exclude others from making, using, offering for sale, selling, or importing the patented invention," in exchange for full disclosure of an invention, H. Schwartz, Patent Law and Practice 1, 33 (2d ed. 1995). It has long been understood that a patent must describe the exact scope of an invention and its manufacture to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." <u>McClain v. Ortmayer</u>, 141 U.S. 419, 424 (1891). Under the modern American system, these objectives are served by two distinct elements of a patent document. First, it contains a specification describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112; <u>see also</u> 3 E. Lipscomb, Walker on Patents §10:1, pp. 183–184 (3d ed. 1985) (Lipscomb) (listing the requirements for a specification). Second, a patent includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, nor the scientific explanation of their operation." 6 Lipscomb § 21.17, at 315–316. The claim "define[s] the scope of a patent grant," 3 <u>id.</u> § 11:1, at 280, and functions to forbid not only exact copies of an invention, but products that go to "the heart of an invention but avoids the literal language of the claim

> by making a noncritical change," Schwartz, supra, at 82. . . .
>
> Characteristically, patent lawsuits charge what is known as infringement, Schwartz, supra, at 75, and rest on allegations that the defendant "without authority ma[de], use[d] or [sold the] patented invention, within the United States during the term of the patent therefor . . . ." 35 U.S.C. § 271(a). Victory in an infringement suit requires a finding that the patent claim "covers the alleged infringer's product or process," which in turn necessitates a determination of "what the words in the claim mean." Schwartz, supra, at 80; see also 3 Lipscomb § 11:2, at 288-290.

Markman v. Westview Instruments, 517 U.S. 370, 373-74 (1996).

It is well-settled that a determination of infringement requires a two-step analysis: "First, the court determines the scope and meaning of the patent claims asserted"; and second, "the properly construed claims are compared to the allegedly infringing device." Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citing Markman, 517 U.S. at 371-73). In conducting this analysis, it must be remembered that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)); see Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

## A. Claim Construction Principles

The Federal Circuit has repeatedly stated that "the words of a claim 'are generally given their ordinary and customary meaning,'" and that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (quoting Vitronics, 90 F.3d at 1582). This provides "an objective baseline from which to begin claim interpretation" and is based upon "the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. at 1313. As noted by the Federal Circuit:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention—the inventor's lexicography—must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)). However, "'[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges,

and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting Phillips, 415 F.3d at 1314). Finally, when construing claim terms and phrases, the Court cannot add or subtract words from the claims or appeal to "abstract policy considerations" to broaden or narrow their scope. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005); see Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims.").

## B. Types of Evidence to Be Considered

In determining the meaning of disputed terms or phrases, the Court first examines the claim language. The Federal Circuit has stated that "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Phillips, 415 F.3d at 1314.

The claims, however, "do not stand alone" and "'must be read in view of the specification, of which they are a part.'" Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52

F.3d 967, 979 (Fed. Cir. 1995) (en banc)); see also Vitronics, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."); Multiform Dessicants, 133 F.3d at 1478 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."). The specification, as required by statute, describes the manner and process of making and using the patented invention, and "[t]hus claims must be construed so as to be consistent with the specification . . . ." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003); see Markman, 517 U.S. at 389 (referencing the "standard construction rule that a term can be defined only in a way that comports with the instrument as a whole"); Phillips, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").

In addition to the claims and specification, the Court considers any relevant prosecution history, which consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during the examination of the patent and any subsequent reexaminations.

Phillips, 415 F.3d at 1317.  The prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Id. (citing Vitronics, 90 F.3d at 1582–83); see Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (indicating that the purpose of consulting the prosecution history as part of claim construction is to exclude any disclaimed interpretation).  "At the same time, because prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'"  Trading Technologies Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1352 (Fed. Cir. 2010) (quoting Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1401 (Fed. Cir. 2008)).

The Court may also examine extrinsic evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  Markman, 52 F.3d at 980.  For example, technical dictionaries may provide the Court with a better understanding of the underlying technology and the way in which one of skill in the art might use the claim terms.  Phillips,

415 F.3d at 1318; see also Vitronics, 90 F.3d at 1584 n.6.
"However, while extrinsic evidence 'can shed useful light on the
relevant art,' [the Federal Circuit has] explained that it is
'less significant than the intrinsic record in determining the
legally operative meaning of claim language.'" Phillips, 415
F.3d at 1317 (quoting C.R. Bard, Inc. v. U.S. Surgical Corp.,
388 F.3d 858, 862 (Fed. Cir. 2004)).

Finally, with respect to general usage dictionaries, the
Federal Circuit has noted that "[d]ictionaries or comparable
sources are often useful to assist in understanding the commonly
understood meaning of words and have been used . . . in claim
interpretation," and that "[a] dictionary definition has the
value of being an unbiased source 'accessible to the public in
advance of litigation.'" Phillips, 415 F.3d at 1322 (quoting
Vitronics, 90 F.3d at 1585).[3] However, the Federal Circuit
cautions that "'a general-usage dictionary cannot overcome art-
specific evidence of the meaning' of a claim term," that "the

---

[3] In Phillips, the Federal Circuit expressly discounted the approach
taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193
(Fed. Cir. 2002), in which the court placed greater emphasis on
dictionary definitions of claim terms. See Phillips, 415 F.3d at
1319-24 ("Although the concern expressed by the court in Texas Digital
was valid, the methodology it adopted placed too much reliance on
extrinsic sources such as dictionaries, treatises, and encyclopedias
and too little on intrinsic sources, in particular the specification
and prosecution history."). The Phillips opinion reaffirmed the
approach used in Vitronics, Markman, and Innova as the proper approach
for claim construction, but acknowledged that there was "no magic
formula," and that a district court is not "barred from considering
any particular sources . . . as long as those sources are not used to
contradict claim meaning that is unambiguous in light of the intrinsic
evidence." Id. at 1324.

use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent," and that "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d at 1322 (quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)). Additionally, "different dictionaries may contain somewhat different sets of definitions for the same words," and "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." Id.

With the foregoing principles in mind, the Court will now examine the patents at issue in this case and the disputed claim terms identified by the parties.

### III. ANALYSIS OF THE IDENTIFIED CLAIM TERMS

In advance of the Markman hearing conducted by this Court, the parties submitted a joint claim construction chart that includes thirteen agreed upon claim terms and eight disputed claim terms. ECF No. 48-2. Two of the agreed upon terms are found in the Anova patents, and eleven agreed upon terms are found in the Promontory patents. The Court adopts all thirteen of the parties' stipulated constructions of the agreed upon terms.

As to the eight disputed terms, three terms are found in Promontory's patents, and the remaining five terms are found in Anova's patents.  The Court begins with the terms found in Promontory's patents.

### A. Promontory's Patents

#### 1. "processor"

##### a. Proposed Constructions & Court Ruling

**Promontory:** "A system component responsible for allocating potential deposit amounts to multiple banks or responsible for one or all of the following: maintaining customer account records, maintaining Settlement Accounts, serving as issuing and paying agent on behalf of Receiving Institutions with respect to deposits established through the Interbank Deposit Service, and serving as subcustodian for Relationship Banks.  The functions of the Processor may be performed by one or more entities"

**Anova:** "One or more computers that are components of an interbank deposit placement system"

**Court:** "A system component responsible for allocating potential deposit amounts to multiple banks or responsible for one or all of the following: maintaining customer account records, maintaining Settlement Accounts, serving as issuing and paying agent on behalf of Receiving Institutions with respect to deposits established through the Interbank Deposit Service, and serving as subcustodian for Relationship Banks.  The functions of the Processor may be performed by one or more entities"

##### b. Discussion

Promontory's proposed construction of this disputed term is drawn directly from the express definition set forth in the specification of each of the nine Promontory patents before this Court.  See Phillips, 415 F.3d at 1316 (indicating that Federal

Circuit cases recognize that when the specification includes a "special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs"). Although such definition is not a model of clarity, it was authored and relied upon by the patentee in submitting the patent application, was reviewed by the PTO in advance of the patent's issuance, and is consistent with the remainder of the specification and the claim terms.

In contrast, Anova's proposed definition, although more direct and concise than Promontory's proposal, seeks to read an additional requirement into the disputed term in that it seeks to require that a "processor" is always "a computer." Because neither the specification nor the prosecution history supports the construction proposed by Anova, which seeks to read an additional limitation into such claim, the Court adopts the construction proposed by Promontory, which is directly supported by the express definition provided in the specification.

Beginning with the claim language, across Promontory's nine patents the word "processor" appears numerous times, sometimes in claims reciting a "computer program product" sometimes in claims reciting a "computer implemented method," and sometimes in claims reciting an "automated method." Across many of such claims, most notably those that expressly recite a computer, it appears from the context of the claim language that the word

12

"processor" frequently refers to a computer (or computer component). However, Promontory is correct that other claims within its patents recite an "automated method" of processing large deposits, making no mention of a computer. See, e.g., '746 Claim 1; see also Nystrom v. TREX Co., Inc., 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed." (citing Tandon Corp. v. United States Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987))). It is also notable that when the word "automated" is used, it sometimes only appears in the preamble to the claim. Compare '746 Claim 1 ("automated" appears only in preamble), with '057 Claim 1 ("automated" appears in preamble and "automatically" appears in method steps (c) and (d)). Accordingly, not only do certain claims not expressly reference a computer, they also do not necessarily require automation as to all method steps.[4]

Moving beyond the claim language, all of Promontory's nine patents share the same specification, and such intrinsic evidence supports the proposed construction advanced by Promontory. First, the specification includes an express definition of the term "processor" which does not limit such

---

[4] Stated differently, while certain steps involved in the processing of a large deposit may be required to occur through an automated process, the claims do not necessarily require that all method steps be automated. For example, it appears that the "receipt" of an order from a bank to process a large deposit may, under certain claims, not require a computer nor require an automated process.

term to a computer, but instead indicates that the functions of the "processor" may be performed by one or more entities. See, e.g., '522 6:41-51 (defining "processor" in the subsection of the specification entitled "Definitions").   Promontory has thus acted as its own lexicographer to define "processor." See 3M Innovative Properties Co. v. Avery Dennison Corp., 350 F.3d 1365, 1372 (Fed. Cir. 2003) (indicating that the rule counseling against importing limitations into the claims "must be strictly enforced" where a patentee provides an express definition of the disputed claim term in the specification and such definition is "devoid" of the limitation sought to be read into the claims). Second, Promontory cites to examples within the specification that lend support to the express "lexicographer" definition set forth therein.   In such instances, the specification appears to use the word "processor" to refer to the person or entity that performs the processing and not to a "computer." See '522 3:46-49 (indicating that a deposit "may be titled in the name of the Processor (as subcustodian for the bank that placed the order)"); '522 12:32-37 (indicating that "the Processor" acts as "issuing agent for the bank"); '522 13:46-38 (indicting that interest rates for unmatched deposits are determined "through a procedure established by the Processor").

Notwithstanding the above, Anova argues that the Court should adopt its proposed construction based on a purported

concession made by Promontory during patent prosecution. However, such argument has force only if one considers, in a vacuum, a single sentence contained in a written filing Promontory submitted to the PTO. The statement Anova singles out is: "[T]he 'processor' referred to throughout the specification, when programmed to perform the steps shown in the flowcharts and diagrams, becomes a special purpose computer, and thereby a new machine." Anova Markman Reply Ex. 1 at 11, ECF No. 44-1. Anova contends that, because such statement references the use of the word processor "throughout the specification," Promontory engaged in a wholesale disavowal of claim scope in each of its nine patents. Such argument, however, fails for a number of reasons.

First, the opening paragraph of Promontory's submission to the PTO reveals that the remarks therein were merely an effort to "preemptively address" a potential rejection of certain claims under the "Oncken" prior art. Id. at 3. The detailed comparison of Promontory's claimed invention and Oncken that follows on the next several pages has little, if anything, to do with whether or not the claimed "processor" is a "computer." Accordingly, Anova's characterization of Promontory's statements as a clear disavowal of claim scope is not compelling.

Second, in section six of Promontory's submission to the PTO, Promontory explains that the claims being discussed, Claims

15

1-20, are not prohibited by 35 U.S.C. § 101 and In re Bilski, 545 F.3d 943 (Fed. Cir. 2008) (en banc) because they are "directed toward a different statutory class of invention, namely a manufacture" as contrasted with a process. Anova Markman Reply Ex. 1 at 10. Promontory then posited an alternative preemptive defense in the event the PTO (improperly) interpreted claims 1-20 as method claims rather than product claims. Promontory noted that, under such hypothetical interpretation, the claims are still patentable because "claims 1-20 recite a computer-implemented process that is clearly tied to a particular machine." Id. at 11. It is only then that Promontory stated that the word "processor" as used throughout the specification, becomes a special purpose computer when programmed to perform the claimed steps. Id. Considering section six of such filing in its entirety, this Court finds that such preemptive comments, made in an effort to thwart a hypothetical rejection that would itself (in the eyes of the filer) be based on a misinterpretation of the very nature of the claims (product vs. method) is insufficient to constitute a clear disavowal of claim scope. See 3M Innovative Properties Co. v. Tredegar Corp., 725 F.3d 1315, 1322 (Fed. Cir. 2013) (indicating that a court should "not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered

claim scope through a clear and unmistakable disavowal" (citing Trading Tech. Int'l, 595 F.3d at 1352, Vitronics, 90 F.3d at 1582-83)) (emphasis added).

Third, as noted by Promontory, in the same PTO filing discussed above, Promontory lays out the similarities between the "Oncken" prior art and the claims at issue, noting that each provided for "an entity that manages the distribution (allocation or assignment of a large deposit of funds)." Anova Markman Reply Ex. 1 at 3 (emphasis added). Promontory's filing then states: "In [Promontory's] claimed invention, that entity is the processor that executes instructions to perform the claimed steps." Id. (emphasis added). Such statement clearly suggests a broad meaning of the term "processor" to include the processing entity, and thus does not limit such term to a computer.

In sum, Promontory's statement to the PTO, when considered in context, does not constitute a "clear and unmistakable" disavowal of claim scope.[5] Accordingly, the Court adopts the broad definition of "processor" set forth in the specification. See Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352,

---

[5] Even if this Court found that Promontory made a clear disavowal, the context of such statement would limit it to the claims being discussed, that is, the claims that expressly require a computer. See Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1333 (Fed. Cir. 2004) (indicating that the patentee's statements to the PTO to distinguish claims that include a certain feature from the prior art "do not rise to the level of a clear disavowal of scope with respect to" other claims that do not include such limitation).

1357 (Fed. Cir. 2004) ("A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification."); PPG Industries v. Guardian Industries Corp., 156 F.3d 1351, 1355 (Fed. Cir. 1998) (recognizing that all ambiguity need not be resolved by the Court in order to "facilitate a comparison between the claim and the accused product"; rather, after defining a claim "with whatever specificity and precision" that is warranted in a specific case, "the task of determining whether the construed claim reads on the accused product is for the finder of fact"). Anova's efforts to read the word "computer" into the construction of the term "processor" in all claims, including those that never reference a computer, is therefore rejected.[6]

### 2. "process large deposits"

#### a. Proposed Constructions & Court Ruling

**Promontory:** Plain meaning or alternatively: "performing functions with the large deposits"

**Anova:** "Automatically allocate portions of large deposits among multiple banks so that the entire deposit is fully insured"

**Court:** Plain meaning

---

[6] The Court also reject's Anova's suggestion that the Merriam Webster dictionary supports its construction. As highlighted by Promontory at the <u>Markman</u> hearing, Anova's brief selectively quotes the Merriam Webster dictionary definition in a manner that excludes the very first definition of "processor," defined as "one that processes." Merriam Webster's Collegiate Dictionary at 929 (10th Ed. 1997).

### b. Discussion

In light of the numerous patents involved, and the parties' welcomed candor regarding the crux of the instant dispute, the best course toward resolving the instant claim construction dispute is to address the crux head on. Anova's proposed construction of the instant term seeks to read two limitations into the definition that do not otherwise appear in the claim language. First, Anova contends that the processing of large deposits must be "automatic." Second, Anova contends that the processing of large deposits must result in the entire deposit being "fully insured." Across the numerous embodiments of Promontory's nine patents, the Court has no doubt that many, if not most, embodiments would utilize an "automatic" system, operated on computers, that is highly effective at allocating large deposits in a manner that all but guarantees that they are fully insured. That said, Anova has failed to demonstrate that the patents require such steps or results in all embodiments.

First, as to the proposed requirement that deposits are processed "automatically," although many claims in Promontory's patents use the word "automated," even more do not. As to claims that do use such term, as previously discussed, the term at times only appears in the preamble, and at times appears in some, but not all, method steps describing how a deposit is processed. See '746 Claim 1; '057 Claim 1. The fact that

individual method steps that do not indicate that they are performed "automatically" are located immediately adjacent to individual method steps that expressly indicate that they are performed "automatically" is a strong indicator that the "automatic" requirement is not universal. See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc., 672 F.3d 1335, 1349 (Fed. Cir. 2012) (explaining that when "adjacent claims use different terms in parallel settings" it supports the finding that "the two [differing] terms were not meant to have the same meaning"). Similarly, while many of Promontory's claims use the phrase "computer program product" or "computer implemented method," not only are these not universal, but the claims that include such language do not require that each step in such computer implemented system operate "automatically." Accordingly, the Court rejects Anova's proposal to read the limitation "automatically" into the instant term.[7]

Second, as to Anova's attempt to import the requirement that the deposit be "fully insured," both the claim construction rules governing a claim's preamble and the patents' shared specification militate against such interpretation. Considering

---

[7] Moreover, Anova's proposal is not a natural reading of the claims. Notably, many of Promontory's claims include a step referencing "receiving at the processor orders . . . to process large deposits." See, e.g., '057 Claim 1. If Anova's construction was adopted, the orders received from banks would have to be orders to "automatically allocate" the deposit into portions across many banks. It is however, highly doubtful that any bank order would itself require or even request "automatic" allocation, rather, such orders are likely to merely request appropriate allocation.

first the claim language itself, the Federal Circuit has offered

the following summary of the rules governing interpretation of a

claim's preamble:

> Whether to treat a preamble term as a claim limitation
> is "determined on the facts of each case in light of
> the claim as a whole and the invention described in
> the patent." Storage Tech. Corp. v. Cisco Sys., Inc.,
> 329 F.3d 823, 831 (Fed. Cir. 2003). While there is no
> simple test for determining when a preamble limits
> claim scope, we have set forth some general principles
> to guide that inquiry. "Generally," we have said,
> "the preamble does not limit the claims." Allen Eng'g
> Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346
> (Fed. Cir. 2002). Nonetheless, the preamble may be
> construed as limiting "if it recites essential
> structure or steps, or if it is 'necessary to give
> life, meaning, and vitality' to the claim." Catalina
> Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d
> 801, 808 (Fed. Cir. 2002), quoting Pitney Bowes, Inc.
> v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir.
> 1999). A preamble is not regarded as limiting,
> however, "when the claim body describes a structurally
> complete invention such that deletion of the preamble
> phrase does not affect the structure or steps of the
> claimed invention." Catalina, 289 F.3d at 809. If
> the preamble "is reasonably susceptible to being
> construed to be merely duplicative of the limitations
> in the body of the claim (and was not clearly added to
> overcome a [prior art] rejection), we do not construe
> it to be a separate limitation." Symantec Corp. v.
> Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1288-89
> (Fed. Cir. 2008). We have held that the preamble has
> no separate limiting effect if, for example, "the
> preamble merely gives a descriptive name to the set of
> limitations in the body of the claim that completely
> set forth the invention." IMS Tech., Inc. v. Haas
> Automation, Inc., 206 F.3d 1422, 1434-35 (Fed. Cir.
> 2000).

American Medical Systems, Inc. v. Biolitec, Inc., 618 F.3d 1354,

1358-59 (Fed Cir. 2010) (emphasis added).

Here, it is in the preamble to each independent claim across Promontory's nine patents where the claims reference large deposits being processed "so that the large deposits are fully insured." However, within the body of the claims, there are repeated references, in one form or another, to deposits being "partitioned" into deposit portions that do not exceed the "established deposit insurance limit." The preambles are therefore "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim." Symantec Corp., 522 F.3d at 1288-89. Accordingly, under the governing law, the language in the preamble should not be interpreted to be a separate limitation requiring full insurance in all instances.

The above conclusion is further supported by a review of the shared specification of Promontory's nine patents. Specifically, the following language indicates that although achieving full insurance is a goal of the claimed systems/methods, such goal is aspirational, and thus, need not be achieved in order to practice the patent:

> (1) The customer is responsible for ensuring that he or she is fully covered by deposit insurance in all deposits (as is currently the case with all other bank accounts) but the IDPS 100 attempts to ensure that the deposits transferred through the IDPS 100 are fully insured. Each customer may be required or requested to identify, at the time he or she places a deposit, information to the IDPS 100 regarding all banks in which it otherwise does not want to place deposits (which would include all banks in which the customer

maintains an account). In situations where the initial run of the algorithm places a deposit in a bank where a particular customer has already insured deposits, the IDPS 100 reallocates such new deposit to another bank;

(2) In accordance with the present invention, the IDPS 100 is an order placement engine that executes an order placement process. The order placement process utilizes a sophisticated algorithm that automatically matches orders based on a pre-defined set of rules. This ensures an order placement and execution utility that seeks to optimize, inter alia, three different variables . . . [including] Maximiz[ing]the percentage of Lending Bank deposits that are fully insured.

(3) The order placement and execution utility seeks to optimize several different variables including:
. . .
Maximize the percentage of the Lending Bank deposits that are fully insured. In order to minimize costs to the IDPS 100 and risk to the Lending Bank, the IDPS 100 attempts to maximize the amount of any Lending Bank deposits used to cover mismatches that are fully insured.

'522 15:22-31; 16:64-17:6, 17:52-53, 18:21-25 (emphasis added).

Based on the above, the Court agrees with Promontory that a "plain meaning construction" is appropriate for the instant term, as "[t]he task of comprehending [claim] words is not always a difficult one," and in some cases claim construction "'involves little more than the application of the widely accepted meaning of commonly understood words.'" Acumed LLC, 483 F.3d at 805 (quoting Phillips, 415 F.3d at 1314)). Here, although the Court adopts a plain meaning construction, it has affirmatively rejected the additional limitations proposed by Anova, and thus has "resolved" the dispute as to the proper

interpretation of the instant claim. Cf. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."); Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1206-07 (Fed. Cir. 2010) (finding "no O2 Micro problem" where the district court not only adopted a "plain and ordinary meaning" construction, but also rejected the defendant's attempt to import a limitation into the disputed claim language because, by rejecting such improper construction, the district court's ruling resolved the legal dispute and did not improperly reserve a legal question for resolution by the jury).

### 3. "order matching process"

#### a. Proposed Constructions & Court Ruling

**Promontory:** Plain meaning, or alternatively: "order matching function"

**Anova:** "An operation that automatically matches orders"

**Court:** Plain meaning

#### b. Discussion

It is apparent from the briefs before the Court that the parties recognize that the dispute as to the instant claim term rises and falls with the resolution of the dispute on the prior claim term—"process large deposits." The Court, in agreement

24

with such viewpoint, expressly incorporates herein its analysis for the prior term that rejects the inclusion of the word "automatically."

Having concluded that it is not proper to read the word "automatically" into the instant term, it is apparent that neither party's proposed construction ("order matching function" or "an operation that . . . matches orders") adds any clarity to the claim language itself. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . [i]t is not an obligatory exercise in redundancy."). Accordingly, the Court adopts Promontory's prosed "plain meaning" construction, as the jury is more than capable of understanding the everyday words that make up the disputed term, and both Promontory's alternative proposal and Anova's proposal with the word "automatically" removed are merely synonyms for the claim language itself.

### B. Anova Patents

#### 1. "depositor"; and

#### 2. "depositor group"

#### a. Proposed Constructions & Court Ruling

**Promontory (for both terms):** Indefinite, or alternatively: "A group of individuals or entities that pool funds for deposit purposes and that are permitted to deposit funds in a NOW account"

**Anova – depositor:** "An individual or entity placing or seeking to place funds in one or more banks"

**Anova – depositor group:** "A group of one or more individuals and/or one or more entities placing or seeking to place funds in one or more banks"

**Court – depositor:** "An individual or entity placing or seeking to place funds in one or more banks"

**Court – depositor group:** "A group of individuals and/or entities placing or seeking to place funds in one or more banks"

### b. Discussion

Each of Anova's four patents in suit includes in its specification the same express, and somewhat narrow, definition of the term "pooled depositor group." The patents do not expressly define the terms "depositor group" or "depositor." Promontory argues that the Anova patents use these three terms interchangeably, and thus, they should all be interpreted to have the same meaning as the expressly defined term "pooled depositor group." Alternatively, Promontory argues that if "depositor" or "depositor group" do mean something different than "pooled depositor group," they are undefined and thus indefinite. Anova counters by acknowledging that although its patents may have one or more typographical errors, notwithstanding such mistakes, the terms at issue are not used interchangeably. Anova further contends that adopting Promontory's position would ignore multiple clear and express statements in the specification indicating that the claimed

invention is not limited to the narrowly defined "pooled depositor groups." Although each party's position has some merit, having viewed the claims and specifications as a whole, Anova's position is more compelling, and the Court therefore adopts Anova's construction for the term "depositor" and Anova's amended proposed construction for the term "depositor group."[8]

Beginning with the claim language itself, various claims across the four patents at issue reference: (1) "depositor" in the singular; (2) "depositors," "depositor group," or "depositor groups," indicating, at a minimum, a plurality of depositors; or (3) "pooled depositor group," which is expressly defined in the specification of Anova's patents as "[a] group of individuals or entities that pool funds for deposit purposes <u>and that are permitted to deposit funds in a NOW account</u>. . . ." '099 3:41-43 (emphasis added). The driving force behind the instant dispute lies in the above emphasized language, because if Promontory's construction is adopted, every claim across Anova's four patents would be limited to depositors that both pool their

---

[8] Promontory argues that Anova's initial proposed construction of "depositor group" could be interpreted as permitting a "group of one." Although Anova disagrees with such contention, Anova subsequently advanced a modified construction of "depositor group" to alleviate Promontory's "group of one" concerns. Anova Markman Reply 19. Because the Court finds that Anova's modified proposal eliminates any chance of confusion, without materially changing Anova's proposal, the Court adopts Anova's modified construction of such term.

funds and are qualified to deposit their pooled funds in a "NOW Account."[9]

Considering both parties' arguments regarding the claim terms themselves, the Court agrees with Anova that the claim terms reveal that "depositor" refers to a singular individual or entity, that "depositor group" refers to a plurality of depositors, and that "pooled depositor group" is a subset of the broader "depositor group" and is limited to pooled depositors permitted to utilize a NOW account. Beginning with the '099 patent, the claims take the familiar form of using a broader term in the independent claims ("depositor," "depositors," "depositor group," or "depositor groups," appear in independent Claims 1, 2, 7, 11 and 12) and then using a narrower term in specific dependent claims (the more narrowly defined "pooled depositor groups" appears in dependent Claims 6 and 16). Such format supports Anova's contention that "depositor(s)" and "depositor groups(s)" have a different meaning than "pooled depositor groups." See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004) (indicating that "[t]he juxtaposition of independent claims lacking any reference to [a proposed limitation] with dependent claims that add [such]

---

[9] As defined in Anova's patents and explained by the parties, a "NOW Account" is a negotiated order of withdrawal account with a commercial bank that places no limits on deposit and withdrawal activity. According to the specification of Anova's patents, "commercial businesses are not permitted to deposit funds in a NOW account." '099 3:45-47.

limitation provides strong support for [the] argument that the independent claims were not intended to require [such limitation]" and that although the resulting presumption can be overcome, "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest"); Phillips, 415 F.3d at 1315 (noting that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"). Moreover, the internal phrasing of Claims 6 and 16 support Anova as they appear to directly contrast "depositor group" with "pooled depositor group" by stating: "wherein the depositor groups comprise pooled depositor groups and wherein the accounts comprise master negotiated order of withdrawal accounts." '099 Claims 6, 16; see '560 Claims 9, 24 (same); see also Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006) (explaining that because the controlling statute requires that "a dependent claim must add a limitation to those recited in the independent claim . . . reading an additional limitation from a dependent claim into an independent claim would not only make that additional limitation superfluous, it might render the dependent claim invalid").

The text of the claims themselves also rather clearly indicates that a "depositor," singular, is not the same as "depositors," plural, or "depositor group(s)," as the term "depositor" can denote a single individual or a single corporation.  First and most obviously, from a grammatical standpoint, the use of the word "depositor" within the context of a writing that also refers to "depositor<u>s</u>" and "depositor group<u>s</u>" in and of itself suggests that "depositor" refers to a single person or entity.

Second, using the '099 patent as an example, Claim 7 references "matching the deposit need with the deposit account postings in a manner that provides deposit insurance for funds <u>deposited by the depositor</u>, wherein matching the deposit need with the deposit account postings includes auctioning available deposits of the <u>at least one depositor</u> to the commercial banks." '099 Claim 7 (emphasis added).  Such phrasing, particularly the second emphasized portion, further suggests that "depositor" refers to a single individual or entity.  However, to the extent any doubt remains, the next three dependent claims state as follows:

> 8.  The method of claim 7 wherein the depositor comprises <u>an individual entity</u>.
> 9. The method of claim 8 wherein the individual entity comprises <u>a human being</u>.
> 10.  The method of claim 8 wherein the individual entity comprises <u>a corporation</u>.

'099 Claims 8-10.[10]  Although Promontory is correct that the word "comprises" in the patent context means "including, but not limited to," CIAS, Inc. v. Alliance Gaming Corp., 504 F.3d 1356, 1360 (Fed. Cir. 2007), the most natural reading of Claims 8-10, when considered in conjunction with independent Claim 7, is that "depositor" can denote a singular person or corporation.  See Every Penny Counts, Inc. v. Am. Express Co., 563 F.3d 1378, 1381 (Fed. Cir. 2009) ("'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" (quoting Phillips, 415 F.3d at 1316)).

Third, because Promontory contends that every depositor is necessarily a pooled group of multiple depositors, the Court notes that if Promontory's construction were adopted, there would be no difference between "one depositor" and "a single depositor group." '099 Claim 7, 14.  However, the patent claims use discrete terms to refer to such depositors in different places, and claim construction rules indicate that the Court should not ignore the patentee's decision to use different terms in similar contexts to refer to different things.  See Innova/Pure Water, Inc., 381 F.3d at 1119 (indicating that "all claim terms are presumed to have meaning in a claim," and that

---

[10] Claims 25-28 of the '560 patent and '651 patent similarly reference "one depositor" and indicate that such depositor comprises a human being or a corporation.

"when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms").

In contrast to the above, the claims of the '651 patent present an example of what is either clumsy use of the phrase "pooled depositor group," or less consistent adherence to a clear distinction between the phrases "pooled depositor group" and "depositor group." Specifically, dependent claim 9 refers to "depositor groups" as do each of Claims 10-13, 16-17 and 19-20, which are all dependent on Claim 9. In contrast, Claim 21, which is also dependent on Claim 9, references "pooled depositor groups" in a manner that, as argued by Promontory, suggests that such term is being used interchangeably with the phrase "depositor groups" as discussed in Claims 9-13, 16-17, and 19-20. Although the Court agrees with Promontory that the phrasing of Claim 21, vis-à-vis the phrasing of the claims that precede it could be interpreted as an example of interchangeable use, other claims in the '651 patent support the finding that the terms "pooled depositor group" and "depositor group" are used distinctively in a manner that does not suggest interchangeable use. Specifically, similar to the '099 patent and '372 patent, dependent Claim 24 of the '651 patent adds the following limitation to the previously stated method claim: "wherein the

depositor groups <u>comprise pooled depositor groups</u> and wherein the accounts comprise <u>master negotiated order of withdrawal accounts</u>." '651 Claim 24 (emphasis added). As discussed above, such phrasing is a strong indicator that "depositor group" and "pooled depositor group" should be given different constructions. See <u>Phillips</u>, 415 F.3d at 1325 (indicating that "claim terms should not be read to contain a limitation 'where another claim restricts the invention in exactly the [same] manner'" (quoting <u>TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.</u>, 264 F.3d 1111, 1123 (Fed. Cir. 2001))) (alteration in original); <u>see also</u> <u>In re Tanaka</u>, 640 F.3d 1246, 1250 (Fed. Cir. 2011) (noting that "each claim of a patent has a purpose that is separate and distinct from the remaining claims").

In addition to its argument with respect to Claim 21 of the '651 patent, Promontory argues that the Court should not place much reliance on Claims 6 and 16 of the '099 patent and Claim 24 of both the '651 patent and '560 patent as a result of the phrasing of dependent claims 48-50 of the '372 patent. Each of such dependent claims refers back to an independent claim (1, 14, and 27) discussing "depositor groups" and claims the method, product, or system of the previously stated claim "wherein the <u>depositor groups comprise depositor groups</u> and wherein the accounts comprise master negotiated order of withdrawal

accounts." '372 Claims 48-50 (emphasis added). Promontory interprets such language as another example of Anova failing to draw a meaningful distinction between "depositor groups" and "pooled depositor groups." Anova counters by suggesting that Claims 48-50 should track the language of the other three patents and that the omission of the word "pooled" is an obvious scrivener's error. Anova's position is arguably supported by the reference in Claims 48-50 to "master negotiated order of withdrawal accounts."

Based only on the claim language, which in most instances distinguishes between "one depositor" (singular), "depositor group(s)" (multiple persons or entities), and "pooled depositor groups" (a self-defined subset of depositor groups), but in other instances arguably blurs the line between "depositor groups" and "pooled depositor groups," the Court would be faced with an inherently difficult, if not impossible, claim construction dilemma. However, it is axiomatic that the claims "do not stand alone" and "'must be read in view of the specification, of which they are a part.'" Phillips, 415 F.3d at 1315 (quoting Markman, 52 F.3d at 979); see Multiform Dessicants, 133 F.3d at 1478 (indicating that the specification is the "best source for understanding a technical term"). The specification, as required by statute, describes the manner and process of making and using the patented invention, and "[t]hus

claims must be construed so as to be consistent with the specification . . . ." Merck & Co., 347 F.3d at 1371.

Here, despite the fact that there are instances in the specification where the term "pooled depositor groups" is used and then, a few words or sentences later, the shortened phrase "depositor group" is used to refer back to the "pooled depositor group" being discussed, see, e.g., '651 17:11-15, it is abundantly clear that, as a whole, the specification does not treat such terms as synonyms. Rather, the specification clearly and expressly states that the patented invention is not limited to pooled groups of depositors that qualify for investing in NOW accounts, which is the definition provided by Anova in the specification for "pooled depositor groups." For example, the specification of the '099 patent states as follows:

> Other entities, such as individual depositors (including corporations and human beings) may also seek insured, liquid deposit opportunities for their funds. These entities face the same difficulties as those described above for pooled depositor groups. Accordingly, there exists a need for an insured or collateralized deposit vehicle for individual depositors.
>
> . . .
>
> In order to address the aforementioned problems associated with providing cash to commercial banks and providing insured, liquid deposit opportunities for pooled depositor groups and individual depositors, one aspect of the invention includes a method and associated computer software for facilitating transactions between depositors and commercial banks.

'099 2:4-9, 25-31 (emphasis added).

Moreover, the most direct statement from the specification of Anova's patents that sheds light on the instant dispute is the following:

> Although the example described above relates primarily to banks posting master NOW accounts, <u>the present invention is not limited to using master NOW accounts</u>. For example, corporations are not permitted to deposit money in master NOW accounts. Accordingly, receiving money from corporations and having commercial banks post accounts <u>that are equivalent to master NOW accounts</u> in which corporations are permitted to deposit cash <u>is intended to be within the scope of the invention</u>. In one exemplary implementation, in order to receive deposits from corporations, the present invention may include using a money market deposit account (MMDA) account. Thus, although the examples described herein relate to master NOW accounts, it is understood that MMDA accounts may be used without departing from the scope of the invention.

'099 8:61-9:8;[11] <u>see also</u> '099 2:45-48 ("For other entities, such as individuals (including human beings or corporations), the deposit account may be a money market deposit account (MMDA) or other time or interest bearing deposit accounts."). Accordingly, although it is abundantly clear that Anova anticipated that the primary and preferred use of its claimed inventions was to facilitate banking transactions involving pooled depositor groups, the claims of such patents are not so limited. <u>See Brookhill-Wilk 1, LLC. v. Intuitive Surgical,</u>

---

[11] Such language also appears in the following locations: '651 18:4-18; '560 18:4-18. Although such language is absent from the '372 patent, Promontory has not requested a separate construction of "depositor" or "depositor group" limited to the '372 patent. <u>Cf. Omega Engineering, Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Inc., 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context."); Digital-Vending Services Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d 1270, 1274 (Fed. Cir. 2012) (indicating in a case where a key limitation appeared in nearly all of the claims across multiple patents, and also appeared repeatedly in the shared specification, that because such limitation did not appear in certain method claims in one of the related patents, it was not a universal limitation appropriate for incorporation into the Court's construction of the disputed claim language).

Based on the above analysis, the Court rejects Promontory's attempt to read into the disputed terms the requirement that depositors must in all instances be a pooled group permitted under banking regulations to deposit funds in a NOW account. As Anova's distinct proposed constructions for "depositor" and "depositor group" are supported by the intrinsic evidence, the Court adopts Anova's construction for the term "depositor" and Anova's amended proposed construction for the term "depositor group."[12]

─────────────────────

[12] In reaching such conclusion, the Court has considered, and rejected, Promontory's prosecution history disavowal argument. The Court rejects such argument for the same reasons it rejected Anova's prosecution history disavowal argument as to Promontory's patents. In short, the statements made to the PTO fall far short of the standard

### 3. "stable funds source" / "stable deposits"

#### a. Proposed Constructions & Court Ruling

**Promontory:** "Source of pooled funds that, when deposited, are usable as core deposits" / "Deposits usable as core deposits"

**Anova:** "Source of funds that, as a whole, do not fluctuate significantly in amount in response to changing conditions and/or the passage of time" / "Deposits that, as a whole, do not fluctuate significantly in amount in response to changing conditions and/or the passage of time"

**Court:** "Source of pooled funds that, as a whole, do not fluctuate significantly in amount in response to changing conditions and/or the passage of time" / "Deposits that, as a whole, do not fluctuate significantly in amount in response to changing conditions and/or the passage of time"

#### b. Discussion

The dispute as to the instant term centers on Promontory's efforts to equate the claim language "stable deposits" with the term "core deposits." Anova's patents expressly define "core deposits" and expressly define "stable funds." Promontory asserts, however, that the definition in the patents as to "stable funds" is ambiguous and indefinite, and Promontory therefore urges the Court to adopt a definition equating "stable funds" and "stable deposits" with "core deposits," the latter of which is a more narrow term in that it requires regulatory

---

necessary to constitute a "clear and unmistakable disavowal." <u>3M Innovative Properties Co.</u>, 725 F.3d at 1322. Anova's statements to the PTO focus on the fact that its patents, unlike the prior art, involving <u>aggregating</u> funds of multiple investors <u>prior to depositing them</u> in order to create a more stable funds source. Such statements do not clearly disavow the practice of aggregating funds from multiple <u>individual</u> investors prior to depositing them.

classification as a "core deposit."  For the reasons discussed below, the Court rejects Promontory's efforts to equate the two terms, and adopts Anova's proposed construction.

Anova's patents expressly provide the following similar, but not equivalent, definitions for "core deposit" and "stable funds":

> Core deposit: A class of deposits <u>deemed by an agency, such as the FDIC</u>, to be stable (constant, minimum fluctuation in total amount, and available at a reasonable cost).

> Stable funds: Pooled funds offered to commercial banks that preferably do not fluctuate significantly in amount as the interest rate changes.

'099 3:37-40, 57-59 (emphasis added).  Both terms plainly require relative stability of the funds being discussed, but a "core deposit" has a more restricted definition because regardless of how steady/unflucating a specific funding source proves to be, if it does not satisfy regulatory requirements, such source cannot be deemed "core."[13]  The fact that the specification in each of Anova's patents expressly provides distinct definitions for such distinct terms goes a long way toward demonstrating that such terms have distinct meanings.

Turning to the language of the claims, in Anova's '372 patent, each of the three independent claims references a "stable funds source" multiple times, mentions "stable deposits"

---

[13] Based on the comments of both parties at the <u>Markman</u> hearing, it appears to the Court that one skilled in the art would consider both "core deposits" and "stable deposits" to be desirable to banks.

once, and makes no mention whatsoever of "core deposits."  Two
dependent claims refer back to the previously disclosed method
or product and add the additional limitation "wherein the
commercial banks report the funds deposited in the accounts as
core deposits."  '372 Claims 13, 26.[14]  The Court agrees with
Anova that such claim language demonstrates that the patentee
used the more restrictive term "core deposits" when intended,
and used the separately defined term "stable deposits" and
"stable funds source" when intended.  See Andersen Corp. v.
Fiber Composites, LLC, 474 F.3d 1361, 1369 (Fed. Cir. 2007)
(discussing the "doctrine of claim differentiation," which is
"based on 'the common sense notion that different words or
phrases used in separate claims are presumed to indicate that
the claims have different meanings and scope'" (quoting Karlin
Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72
(Fed. Cir. 1999))); Phillips, 415 F.3d at 1315 (noting that "the
presence of a dependent claim that adds a particular limitation
gives rise to a presumption that the limitation in question is
not present in the independent claim").  Promontory's contention
that the express reference in the claims to "core deposits" is

---

[14] A review of the '099 patent reveals a similar pattern, use of
"stable funds source" and "stable deposits" in all the independent
claims, and a reference to funds being reported as "core deposits"
found in two dependent claims.  '099 Claims 1-2, 5, 7, 11-12, 15.  In
the '651 and '560 patents, many but not all claims reference "stable
funds"; however, no claims reference "stable deposits" or "core
deposits."

included to reflect the "reporting" of such deposits as core, as contrasted with the qualification of such deposits as core, is not particularly compelling.[15]

A review of the specification, beyond the definition section, adds further support for the rejection of Promontory's proposal and the adoption of Anova's prosed construction. Although the Court has before it three slightly different specifications,[16] to the extent they discuss "core deposits" and "stable deposits/stable funds sources," the patents appear relatively consistent in their separate treatment of such terms. Turning to the '372 patent, the final sentence of the "Abstract" explains the benefit to the banks of the claimed methods and systems: "The commercial banks have access to a <u>stable source of funds</u> that banking regulators <u>may permit</u> to be treated as <u>core deposits</u>." '372 Abstract (emphasis added). The "Background Art" section of the specification likewise explains as follows:

> In the banking industry, it is desirable to maintain a certain percentage of core deposits. Core deposits are deposits that do not change significantly in amount with fluctuations in the interest rate paid on the deposits. Savings account deposits are one example of a bank's core deposits. In the United States, the percentage of core deposits affects the bank's ability to maintain a favorable regulatory rating.

---

[15] Promontory offers no explanation as to why a bank would not report deposits that qualify as "core deposits" to the appropriate regulatory agency because, as explained by the parties, doing so only benefits such bank.

[16] The '651 patent and '560 patent share a common specification.

> In addition to core deposits, banks often rely on non-core funding sources, such as brokered CDs. Brokered CDs are offered by a bank to retail customers through a deposit broker. Brokered CDs are less stable as a source of funds for banks than core deposits because depositors in brokered CDs are typically sensitive to interest rate fluctuations.
>
> Another problem with using brokered CDs to obtain cash is that in the United States, if a bank maintains too high of a percentage of brokered deposits, the bank may be sanctioned by a regulatory agency, such as the Federal Reserve for federally chartered banks or a state banking agency for state chartered banks. Yet another problem associated with using brokered deposits is that banks are required to pay a broker's commission for brokered deposits. <u>Thus, in the banking industry, there exist [sic] a need for a new way for banks to obtain stable funds</u>.

'372 1:19-41 (emphasis added). Such introductory comments are consistent with Anova's contention that there is a difference between stable deposits and core deposits, and even if not deemed "core" by a regulatory agency, banks benefit from "stable deposits/stable funds sources."

Another reference to "core deposits" in the specification that supports Anova is the statement that the claimed invention allows banks to "obtain stable money for core deposits <u>and</u> term funds" which allows commercial banks to "reduce their percentages of brokered deposits and thereby increase the likelihood of a favorable regulatory rating." '372 7:8-12 (emphasis added). Such language suggests that "stable money" is broader than "core deposits" because it includes "term funds." Additionally, such phrasing suggests that all "stable money"

helps improve a bank's likelihood of obtaining a favorable regulatory ruling, even if such deposits are not deemed "core."[17]

Additional references in the specification to "stable" and "core deposits" do not suggest interchangeable use of such terms, nor do they in any way suggest that a system designed as claimed must necessarily achieve a deposit that is approved as "core" by the FDIC. Such a rating is clearly desirable, and appears to be the aspirational goal of the claimed invention. However, the intrinsic evidence does not suggest that achieving "core" status is a requirement, except where expressly indicated in the language of the claims. Accordingly, after consideration of the intrinsic record, the Court rejects Promontory's efforts to read "core deposit" into the construction of "stable deposit" or "stable funds source." [18]

---

[17] Such statements also lend context to the specification's earlier reference to the claimed invention relating to methods, systems, and computer program products that provide commercial banks with deposit funds that "may be permitted by regulatory authorities to count as stable deposits." '372 1:7-15 (emphasis added). Although the Court found that counsel for neither party provided a clear answer at the Markman hearing to the Court's inquiry regarding whether there is a formal regulatory definition of "stable deposits," the algorithms and other various regulatory testing methods discussed by the parties at a minimum revealed that regulatory agencies evaluate the stability of a bank's deposits. It is also abundantly clear that the more stable the regulatory agency deems the deposits, the better it is for the bank.

[18] As an exhibit to its opening claim construction brief, Promontory submitted a prosecution history document from what appears from the application number to be Anova's '099 patent. Promontory Markman Brief Ex. 16, ECF No. 36-17. Such filing before the PTO indicates that Anova modified the previously asserted claims to eliminate the claim language "usable by the commercial banks as core deposits" and replaced it with "usable by the commercial banks as stable deposits." Id. at 2. Such evidence only bolsters the Court's above conclusion

As to the suitability of Anova's proposed construction, Promontory asserts that such construction is indefinite because it does not create a sufficient standard to determine whether a particular deposit is "stable." Apparently in response to Promontory's indefiniteness argument, Anova's proposed construction removes the word "preferably" from the express definition for "stable funds" that is provided in the patents. Even with such change, Promontory argues that Anova's proposed construction is unworkable and will result in a "battle of the experts" to define stability.[19] Having considered the parties' briefs and arguments on such issue, the Court finds that Anova's proposal is sufficiently definite to assist the trier of fact in this case. Although Promontory appears correct that Anova's proposed construction does not provide a narrowly delineated definition such that any investment can be instantly classified as "stable" or "unstable," such fact does not mean that one skilled in the art would not understand such term as used in the claims. See Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed Cir. 2005) ("[T]he purpose of the definiteness

---

that Anova did not use such terms interchangeably, but instead used the term "stable" when it meant stable, and "core" when it meant core.

[19] Promontory's argument that Anova's patents' express definition of "stable funds" is too broad to clearly define what is being referenced is not unlike Anova's argument that Promontory's patents' definition of "processor" is too broad to clearly define what is being referenced. Just as this Court concluded that additional limitations should not be read into Promontory's "lexicographer" definition of "processor," the Court concludes that additional limitations should not be read into Anova's "lexicographer" definition of "stable funds."

requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." (citing Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003))). As the specification of Anova's patents acknowledge the need for new types of "stable" funds sources, and explain that the patented invention creates such stability through aggregating funds of various depositors prior to deposit, it appears to the Court that a laymen, let alone one skilled in the art, would be on notice as to the scope of the claims. Accordingly, Promontory's indefiniteness argument fails.

As Promontory does not offer a suitable construction of this term that might somehow eliminate some of the "gray area" that Promontory contends is created by Anova's broad construction, the Court largely adopts Anova's proposed construction. Anova's proposal resolves the parties' claim dispute and provides a workable definition of the term that can be understood and applied by the finder of fact. The Court does, however, agree with Promontory (and Anova) that the word "preferably" should not be included in the construction adopted by the Court. Furthermore, although the above analysis jointly addresses the construction of "stable funds source" and "stable deposits," as to the former, the Court agrees with Promontory that Anova's patents expressly define "stable funds" as "pooled"

funds.   '099 3:57-59.   As Anova has failed to offer any
compelling justification for dropping the word "pooled" from the
construction of "stable funds source," based on Anova's own
lexicographer definition, which appears in all four of Anova's
patents, the Court inserts the word "pooled" into Anova's
proposed definition for "stable funds source."

### 4. "aggregating, prior to the depositing of the funds available for deposit . . . the deposit needs"

#### a. Proposed Constructions & Court Ruling

**Promontory:** "Combining from disparate sources amounts of
funds desired to be deposited in order to provide a stable
funds source, prior to depositing the funds in one or more
commercial bank accounts, in order to achieve a higher
yield, and where the funds are not deposited upon receipt
in accordance with depositor's preferences and amounts of
the depositor's funds already deposited with particular
banks"

**Anova:** "Combining from disparate sources amounts of funds
desired to be deposited in order to provide a stable funds
source, prior to depositing the funds in one or more
commercial bank accounts"

**Court:** "Combining from disparate sources amounts of funds
desired to be deposited in order to provide a stable funds
source, prior to depositing the funds in one or more
commercial bank accounts"

#### b. Discussion

A comparison of the parties' proposed constructions reveals
that the parties are in agreement with respect to the first half
of Promontory's proposal, but that Promontory is seeking to
engraft two additional requirements onto such construction: (1)
that the funds are not deposited upon receipt in accordance with

46

the depositor's preferences; and (2) that the funds are aggregated in order to achieve a higher yield. As argued by Promontory, both of such additional requirements are necessary based on statements Anova made to the PTO during patent prosecution. For the reasons discussed below, the Court rejects Promontory's proposed additions, and adopts as its construction the agreed upon language.

### i. "where the funds are not deposited upon receipt in accordance with depositor's preferences . . ."

As Anova argues in its reply brief, a review of the prosecution history relied on by Promontory reveals that the disputed statements were made by Anova to the PTO in order to demonstrate that, unlike the prior art, Anova's patents cover a system/method that combines funds from disparate sources prior to depositing such funds. Such pre-deposit combination helps provide a more stable funds source, which both benefits banks, and benefits investors or investor groups because it makes their investment more desirable to banks. It is not entirely clear why Anova did not stop after saying "[the prior art] discloses that funds from individual depositors are deposited upon receipt," but instead went on to say "in accordance with depositor preferences and amounts of the depositor's funds already deposited with particular banks." Promontory Markman Brief Ex. 16 at 14, ECF No. 36-17. However, it is clear from the context of such writing that it was the first part of that

sentence that was the primary focus of the argument being advanced by Anova. Notably, Anova summarized such paragraph by stating: "Thus, because [the prior art] discloses that funds from one depositor are deposited without regard to funds of other depositors, [the prior art] teaches away from a system that aggregates funds from plural different depositor groups as claimed." Id.

After considering the context of the document relied on by Promontory, the Court agrees with Anova that the distinction being made before the PTO was "not that the subject matter of the application never deposited funds from depositors in accordance with their preferences and amounts already on deposit at other banks," Anova Markman Reply 25, but rather, that the prior art never envisioned aggregation of funds prior to deposit as claimed in Anova's application, see 3M Innovative Properties Co., 725 F.3d at 1326 (indicating that Federal Circuit law "warn[s] that, because the prosecution history represents an ongoing negotiation between the PTO and the inventor, it often lacks the clarity of the specification and thus is less useful for claim construction purposes") (internal quotation marks and citations omitted). Accordingly, for the same reasons that this Court previously rejected both Anova's and Promontory's efforts to demonstrate that the other party disavowed claim scope during prosecution, the Court finds that no clear disavowal occurred

that impacts the construction of the instant term. Because the portion of the construction that is agreed upon by both parties already clearly indicates that funds from multiple investors must be aggregated "prior to" being deposited, the additional limitation sought by Promontory is unnecessary and is therefore rejected by the Court. See Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("'It is improper for a court to add extraneous limitations to a claim, that is limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'" (quoting Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 950 (Fed. Cir. 1993))).

### ii. "in order to earn a higher yield"

The Court likewise rejects Promontory's proposal to read into the claims the additional requirement that aggregation of fund sources prior to deposit must always generate "a higher yield." Again, consideration of the context of the prosecution document relied on by Promontory reveals that the limitation sought by Promontory is not warranted. Notably, the essence of Anova's argument before the PTO was not focused on earning a higher yield, but rather, focused on the type of services being provided under the prior art as contrasted with the claimed invention. Anova explained to the PTO that while the prior art focused on a "bank to bank" deposit placement system, Anova's

invention was a deposit "broker" system that provides a "depositor to bank" service. As explained to the PTO, Anova's system "sets the rates for both the depositor and the receiving banks" and in essence matches deposits seeking "FDIC insurance, liquidity and aggregated higher yield" with banks seeking "a lower cost wholesale funding source." Promontory Markman Brief, Ex. 16 at 15-16. The fact that Anova "summarized" its argument to the PTO in a manner that referenced its invention as "earning a higher yield" through aggregating deposits is a far cry from a clear disavowal of claim scope requiring that such system necessarily earn a higher yield.

The Court therefore finds that Anova's statements to the PTO regarding the foreseeable benefits of its invention are not an express relinquishment of claim scope. See Epistar Corp. v. International Trade Comm'n, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (indicating that, to be successful, the defendant's prosecution history disavowal argument must "overcome a heavy presumption that claim terms carry their full ordinary and customary meaning" by demonstrating that "the patentee expressly relinquished claim scope" (citing Omega Eng'g v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003))). Notably, just as Promontory's statements to the PTO during prosecution of its patents were not focused on the limitation that Anova sought to read into the claims, Anova's statements to the PTO were not

focused on the "higher yield" requirement Promontory seeks to read into the instant claim.  Rather, references to a "higher yield" are properly interpreted as Anova's explanation of one of the benefits of the newly conceptualized system it sought to patent.  None of Anova's statements, however, clearly indicate that a higher yield must be achieved in each and every instance when a new deposit is made through the claimed system. Accordingly, the Court rejects Promontory's efforts to read additional limitations into this claim, and adopts the initial agreed upon portion of the parties' proposals without further restriction.

### 5. "determine whether the first set of requirements matches the second set of requirements" / "determining whether the first set of requirements matches the second set of requirements"

#### a. Proposed Constructions & Court Ruling

**Promontory:** Indefinite

**Anova:** Plain meaning

**Court:** Plain meaning

#### b. Discussion

Promontory's argument as to the instant term is grounded in a single passage in the specification of Anova's '651 and '560 patents which discusses an exemplary embodiment of the claimed invention.  Specifically, in describing "one embodiment" of the

process that "matches" the requirements of the supply and demand for funds, Anova's patents describe the following:

> In one embodiment . . . [o]n control center 106 may reside a highly flexible allocation model (software) driven by a matrix of parameters representing investors' properties, account types, government regulations, geographical limits, applies business rules, reconciles pending transactions against existing databases (i.e. bank holding reports), and a decision tree which solves equations that enable the matching the supply of funds with demand for such funds in real time. One example of such a model is ANOVA Corporation's Parametric Model for Allocation of Investment Funds (PAMAIF).RTM.

'651 6:52-63. Promontory does not contend that the word "match" as used in Anova's claims is itself ambiguous, and in an illuminating comparison, Promontory previously argued that the similarly phrased "order matching process" claimed in Promontory's own patents is definite and subject to a "plain meaning" construction. See supra Part III.A.3. However, Promontory takes the position that through referencing Anova's own proprietary PAMAIF "allocation method" as one embodiment of the invention, without explaining how Anova's algorithm operates, Anova has rendered its otherwise clear claim language indefinite. As described below, the Court rejects Promontory's argument and adopts a plain meaning construction of the instant term.

A careful reading of the specification of Anova's patents reveals that although the proprietary "allocation method" mentioned in the specification is not described, nothing in the

specification suggests that such method operates in a manner that in any way changes the plain meaning of the claim language that requires "matching" a first set of requirements with a second set of requirements. Rather, the described Anova allocation method acknowledges that different depositors qualify for different investment products, and certain investors may place additional restrictions on their investments, such as requiring that the investment remain in the state. '651 6:64-7:3. The referenced Anova proprietary allocation method, although not described in detail, is sufficiently described to illustrate to one skilled in the art that it is but one example of how the claimed system "matches" the requirements of the suppliers of funds with the requirements of the banks receiving such funds. See Retractable Techs., Inc. v. Becton, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (indicating that federal courts should "strive to capture the scope of the actual invention, rather than strictly limit[ing] the scope of the claims to disclosed embodiments" (citing Phillips, 415 F.3d at 1323-24)).

At the Markman hearing, Promontory argued that the mere mention in the specification of Anova's "PAMAIF" allocation system undercut the otherwise clear language of the claims because it created the possibility of a "PAMAIF match" without defining the outer bounds of such a match, thus resulting in indefinite claim language not subject to construction. Such

argument, however, both discounts the otherwise clear claim language indicating that a first set of <u>requirements</u> is matched with a second set of <u>requirements</u>, and ignores the case law indicating that the specification generally should not be read to trump the claim language. See <u>Generation II Orthotics Inc.</u> <u>v. Medical Technology Inc.</u>, 263 F.3d 1356, 1367 (Fed. Cir. 2001) (finding that the district court erred by "importing a characteristic of a disclosed or preferred embodiment" into a claim term); see also <u>In re Johnston</u>, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("As a matter of linguistic precision, optional elements do not narrow the claim because they can always be omitted.").

Although the patent does not describe exactly how Anova's PAMAIF allocation method operates,[20] according to the specification, it operates in a manner that "match[es] pending deposits" with "bank demand" for such deposits. '651 7:3-9. Although such proprietary method could conceivably place varying weight on any number of factors, regardless of the precise metrics, such described method is plainly consistent with the claim language indicating that a first set of requirements must

---

[20] As a means for comparison, the specification to Promontory's patents similarly discusses a "sophisticated algorithm that automatically matches orders based on a pre-defined set of rules," yet the specification does not explain the pre-defined rules or how they match depositors with banks, and instead only broadly defines a non-exhaustive list of variables sought to be "optimized." '522 16:66-17:7. Arguably, such language "merely touts the [sophistication] of [the algorithm] without explaining how it works." Promontory Markman Brief 22, ECF No. 36.

be "matched" with a second set of requirements. Nothing in the specification suggests, as posited by Promontory, that PAMAIF in any way broadens the common understanding of the familiar process of "matching" the requirements of party A with the requirements of party B. Cf. Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1364-65 (Fed. Cir. 2010) (affirming the district court's broad construction of the claim term "sound presentation" and noting that the plaintiff failed to identify any support in the specification for limiting such "ordinary term with a plain meaning"). Accordingly, Promontory's position is rejected, and the Court finds that the very limited discussion of PAMAIF in the specification as it relates to a single embodiment of the invention does not operate to make indefinite the easily understood claim language that appears in every independent claim of the '651 and '560 patents. The Court thus agrees with Anova and adopts a "plain meaning" construction of the instant term.

## IV. CONCLUSION

For the reasons set forth above, the Court issues this Opinion and Order as the construction of the relevant claim terms in the thirteen patents at issue in this case.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

_____ /s/ ⟨signature⟩
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 24 , 2014